# 14-2853-cv

_____

In the
UNITED STATES COURT OF APPEALS
for the
SECOND CIRCUIT

_____

TEACHERS' RETIREMENT SYSTEM OF LOUISIANA, CHRISTINE FLECKLES,

*Plaintiffs - Appellants,*

– v. –

L. NORMAN SHOWERS, on behalf of himself and all other similarly situated,
MICHAEL FEITERLAND, PAUL SCHAPKA, MICHAEL FEITLER, ANTHON JOHNSON,

*Plaintiffs,*

– v. –

PFIZER, INC., HENRY A. McKINNEL, GAIL CAWKWELL, JOSEPH M. FECZKO,
KAREN L. KATEN,

*Defendants - Appellees,*

JOHN L. LaMATTINA,

*Defendant.*

_____

On Appeal from the United States District Court
for the Southern District of New York
_____

## BRIEF FOR PLAINTIFFS-APPELLANTS
_____

**JOSEPH HAGE AARONSON LLC**
Gregory P. Joseph
Douglas J. Pepe
Sandra M. Lipsman
485 Lexington Avenue, 30th Floor
New York, New York 10017
212-407-1200

**MASSEY & GAIL LLP**
Jonathan S. Massey
1325 G St. NW, Suite 500
Washington, D.C. 20005
202-652-4511

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
James J. Sabella
Charles T. Caliendo
485 Lexington Avenue, 29th Floor
New York, New York 10017
646-722-8500

**KESSLER TOPAZ MELTZER
& CHECK, LLP**
David Kessler
Andrew L. Zivitz
Matthew L. Mustokoff
280 King of Prussia Road
Radnor, Pennsylvania 19087
610-667-7706

*Attorneys for Plaintiffs - Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants hereby disclose:

Plaintiff-Appellant Teachers' Retirement System of Louisiana has no parent corporation, and no public corporation holds 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .................................................. i

TABLE OF AUTHORITIES .......................................................................... v

PRELIMINARY STATEMENT ..................................................................... 1

JURISDICTION ........................................................................................... 7

ISSUES PRESENTED ................................................................................. 7

STATEMENT OF THE CASE ....................................................................... 8

    A.    Factual Background .................................................................. 9

    B.    District Court Rulings Recognizing the Strength of
        Plaintiffs' Claims ..................................................................... 13

    C.    Professor Fischel's Event Study and Original Report ............. 18

    D.    Professor Fischel's Supplemental Report and the
        Motion *in Limine* ................................................................... 21

        (1)    The 9.7% Proportionate Adjustment ............................. 22

        (2)    The Pharmacia Statements............................................. 25

    E.    The District Court's Ruling on the Motion *in Limine*
        Excluding Professor Fischel's Testimony in Its Entirety ........ 26

    F.    Defendants Seek a Continuance of the Trial............................ 28

    G.    Professor Fischel's Amended Supplemental Report................ 28

    H.    The District Court's Order Granting Summary
        Judgment to Pfizer.................................................................. 31

SUMMARY OF ARGUMENT.................................................................... 34

STANDARD OF REVIEW .......................................................................... 36

ii

ARGUMENT ........................................................................ 37

I.   THE SUPPLEMENTAL AND AMENDED SUPPLEMENTAL
     REPORTS SATISFIED RULE 702 AND *DAUBERT* ..................... 37

     A.   The 9.7% Adjustment in Professor Fischel's
          Supplemental and Amended Supplemental Reports
          Was Not the Product of a New Methodology .......................... 39

     B.   Choosing Between "Putatively Valid" Alternatives
          Was Not the Role of the District Court .................................... 43

     C.   Professor Fischel Was Not Required to "Disaggregate"
          Inflation Attributable to Pharmacia Statements
          Because He Never Attributed Inflation to Them .................... 46

          1.   Professor Fischel's Analysis Was Not Predicated
               on Any "Assumption" Affected by the Pharmacia
               Ruling ............................................................................ 48

          2.   Professor Fischel's Amended Supplemental
               Report Was Not Inconsistent with His Prior
               Testimony ...................................................................... 50

          3.   Plaintiffs' Inflation Maintenance Claim Required
               No "Disaggregation." ...................................................... 51

          4.   Disaggregation Was Unnecessary under the
               Private Securities Litigation Reform Act As a
               Matter of Law ................................................................ 56

II.  IT WAS AN ABUSE OF DISCRETION TO EXCLUDE
     THE INDISPENSABLE TESTIMONY OF A QUALIFIED
     EXPERT THAT THREATENED NO PREJUDICE TO
     DEFENDANTS WHERE NO DISCOVERY RULE OR
     ORDER WAS VIOLATED ................................................................ 57

     A.   Plaintiffs Were Not Dilatory .................................................... 58

     B.   Professor Fischel's Testimony Was Critical to
          Plaintiffs' Case ......................................................................... 59

iii

C.     There Was No Prejudice to Defendants ................................... 62

III.    THE DISTRICT COURT ERRED IN DISMISSING
CLAIMS BASED ON THE PHARMACIA STATEMENTS ........... 64

CONCLUSION .......................................................................................... 66

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7) ..................... 68

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Rent-a-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013) .................................................................. 38

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ....................................................... 38, 41, 42

*Andler v. Clear Channel Broad., Inc.*,
670 F.3d 717 (6th Cir. 2012) ................................................................. 42

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ............................................................. 42

*Auto-Owners Ins. Co. v. Uniden Am. Corp.*,
503 F. Supp. 2d 1087 (E.D. Wis. 2007) ................................................ 45

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................. 2

*Bazemore v. Friday*,
478 U.S. 385 (1986)................................................................................ 40

*Borawick v. Shay*,
68 F.3d 597 (2d Cir. 1995) .................................................................... 38

*Brennan's Inc. v. Dickie Brennan & Co.*,
376 F.3d 356 (5th Cir. 2004) ................................................................ 40

*Burger v. Excel Contractors, Inc.*,
No. 12-cr-01634, 2013 WL 5781724 (D. Nev. Oct. 25, 2013) ............... 59

*Capitol Records v. Mp3tunes, LLC*,
No. 07-cv-9931, 2014 WL 503959 (S.D.N.Y. Jan. 29, 2014) ............... 62

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
No. 00-cv-2838, 2008 WL 4737173 (N.D. Ga. Mar. 14, 2008)........ 42, 43

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) .................................................................. 54

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011) ...................................................... 62

*In re City of N.Y.*,
    607 F.3d 923 (2d Cir. 2010) ................................................................. 66

*City of Pomona v. SQM N. Am. Corp.,*
    750 F.3d 1036 (9th Cir. 2014) ................................................................ 38

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).......................................................................... *passim*

*David v. Caterpillar, Inc.*,
    324 F.3d 851 (7th Cir. 2003) ................................................................. 57

*Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*,
    388 F.3d 976 (6th Cir. 2004) ................................................................. 61

*Dunning v. Bush*,
    536 F.3d 879 (8th Cir. 2008) ................................................................. 61

*In re DVI, Inc. Sec. Litig.*,
    No. 03-cv-5336, 2014 WL 4634301 (E.D. Pa. Sept. 16, 2014) .............. 56

*Ehrenhaus v. Reynolds*,
    965 F.2d 916 (10th Cir. 1992) ................................................................ 61

*Elbit Sys., Ltd. v. Credit Suisse Group*,
    917 F. Supp. 2d 217 (S.D.N.Y. 2013) ..................................................... 65

*FindWhat Investor Grp. v. Findwhat.com,*
    658 F.3d 1282 (11th Cir. 2011) ................................................... 37, 54, 55

*Gillum v. United States,*
    309 F. App'x 267 (10th Cir. 2009).......................................................... 61

*Goldberg v. Household Bank, FSB*,
    890 F.2d 965 (7th Cir. 1989) ................................................................. 19

*Gutierrez v. Wells Fargo Bank, N.A.*,
    730 F. Supp. 2d 1080 (N.D. Cal. 2010),
    *rev'd*, 704 F.3d 712 (9th Cir. 2012)....................................................... 45

vi

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) ................................................................... *passim*

*Hathaway v. Coughlin*,
   99 F.3d 550 (2d Cir. 1996) ...................................................... 36

*Iacobelli Constr., Inc. v. Cnty. of Monroe*,
   32 F.3d 19 (2d Cir. 1994) ........................................................ 38

*Janus Capital Group, Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011) ............................................................. 64

*John Morrell & Co. v. Local Union 304A, United Food &
   Commercial Workers, AFL-CIO*,
   913 F.2d 544 (8th Cir. 1990) ................................................... 45

*In re Joint E. & S. Dist. Asbestos Litig.*,
   52 F.3d 1124 (2d Cir. 1995) ............................................. 37, 38

*Kerzer v. Kingly Mfg.*,
   156 F.3d 396 (2d Cir. 1998) .................................................... 64

*Koon v. United States*,
   518 U.S. 81 (1996) ................................................................... 36

*Lapsley v. Xtek, Inc.*,
   689 F.3d 802 (7th Cir. 2012) ................................................... 38

*Leung v. N.Y.U.*,
   No. 13-2267-cv, 2014 WL 5137526 (2d Cir. Oct. 14, 2014) ................. 36

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
   923 F. Supp. 2d 511 (S.D.N.Y. 2013) ............................... 53, 54

*Linkco, Inc. v. Fujitsu Ltd.*,
   No. 00-cv-7242, 2002 WL 158551 (S.D.N.Y. July 16, 2002) ............... 62

*Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*,
   13 F. Supp. 2d 430 (S.D.N.Y. 1998) ...................................... 45

*Manpower, Inc. v. Ins. Co. of Pa.*,
   732 F.3d 796 (7th Cir. 2013) ................................................... 40

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) ............................................................ 43, 46

*McIntire v. China MediaExpress Holdings, Inc.*,
No. 11-cv-0804, 2014 WL 4049896 (S.D.N.Y. Aug. 15, 2014) ............. 52

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
639 F.3d 11 (1st Cir. 2011) ..................................................................... 42

*Nelson v. Matrixx Initiatives*,
No. 09-cv-02904, 2012 WL 3627399 (N.D. Cal. Aug. 21, 2012) .......... 62

*Papyrus Tech. Corp. v. NYSE, LLC*,
257 F.R.D. 39 (S.D.N.Y. 2009) .............................................................. 60

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*,
No. 11-cv-726, 2013 WL 4409434 (E.D.N.Y. Aug. 2, 2013) ................. 63

*Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*,
No. 12-cv-220, 2014 WL 1572746 (D. Conn. Apr. 17, 2014) .......... 57, 62

*In re Puda Coal Sec. Litig.*,
No. 11-cv-2598, 2014 WL 3427284 (S.D.N.Y. July 14, 2014) .............. 65

*Redd v. N.Y. State Div. of Parole*,
923 F. Supp. 2d 393 (E.D.N.Y. 2013) .................................................... 63

*Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*,
280 F.R.D. 147 (S.D.N.Y. 2012) ............................................................ 63

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
No. 94-cv-5587, 2002 WL 31780188 (S.D.N.Y. Dec. 11, 2002) ........... 38

*Rule v. Brine, Inc.*,
85 F.3d 1002 (2d Cir. 1996) ................................................................... 65

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
318 F.3d 592 (4th Cir. 2003) ................................................................. 57

*Sauer v. Burlington N. R.R.*,
106 F.3d 1490 (10th Cir. 1997) .............................................................. 56

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ................................................................. 54

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ................................................................. 42

*SEC v. Pentagon Capital Management PLC*,
725 F.3d 279 (2d Cir. 2013) ................................................................. 65

*Sherrod v. Lingle*,
223 F.3d 605 (7th Cir. 2000) ................................................................. 61

*Singer v. Ferro*,
711 F.3d 334 (2d Cir. 2013) ................................................................. 37

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) ................................................................. 45

*Steele v. Aramark Corp.*,
535 F. App'x 137 (3d Cir. 2013) ............................................................. 61

*Stollings v. Ryobi Techs., Inc.*,
725 F.3d 753 (7th Cir. 2013) ................................................................. 41

*United States v. Allen*,
155 F.3d 35 (2d Cir. 1998) ..................................................................... 2

*United States v. Mimms*,
43 F.3d 217 (5th Cir. 1995) ................................................................... 48

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) .............................................. 52, 53

*In re Vivendi Universal, S.A. Sec. Litig.*,
No. 02-cv-5571, slip op. (S.D.N.Y. Aug. 12, 2009) ............................... 41

*Walker v. Soo Line R.R.*,
208 F.3d 581 (7th Cir. 2000) ................................................................. 45

*Wegener v. Johnson*,
527 F.3d 687 (8th Cir. 2008) ................................................................. 57

ix

*Whiteside Biomechanics, Inc. v. Sofamor Danek Grp., Inc.*,
   88 F. Supp. 2d 1009 (E.D. Mo. 2000) ...................................................... 46

*Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*,
   170 F.3d 985 (10th Cir. 1999) ................................................... 58

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
   571 F.3d 206 (2d Cir. 2009) ........................................... 36, 57, 58

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ........................................... 60, 61

**STATUTES AND RULES**

15 U.S.C. §78u-4(f) ..................................................... 56

28 U.S.C. §1291 ..................................................... 7

28 U.S.C. §1331 ..................................................... 7

SEC Rule 10b-5, 17 C.F.R. §240.10b-5 ..................................................... 14

Fed. R. App. P. 32(a)(7)(B) ..................................................... 68

Fed. R. App. P. 32(a)(7)(C) ..................................................... 68

Fed. R. Civ. P. 23 ..................................................... 59

Fed. R. Civ. P. 23 ..................................................... 59

Fed. R. Civ. P. 26(a)(2)(e) ..................................................... 40

Fed. R. Civ. P.26(e) ..................................................... 5, 59

Fed. R. Civ. P. 26(e)(1) ..................................................... 47

Fed. R. Civ. P. 26(e)(2) ..................................................... 3, 33

Fed. R. Evid. 702 ..................................................... *passim*

S.D.N.Y. Local Civil Rule 56.1 ..................................................... 10

x

**OTHER AUTHORITIES**

Sanjai Bhagat & Roberta Romano, *Event Studies and the Law*, *Part I*,
    4 AM. L. & ECON. REV. 141, 142 (2002) .................................................. 40

## PRELIMINARY STATEMENT

Appellants are court-appointed representatives of a certified Class of millions of Pfizer investors ("**Plaintiffs**") who were defrauded into purchasing Pfizer stock by Appellees' (or "**Defendants'**" or "**Pfizer's**") misrepresentations and omissions about the cardiovascular risks associated with two Pfizer drugs, Celebrex and Bextra. When the truth was ultimately revealed, Pfizer's stock price plummeted, causing billions of dollars in provable damages to the Class.

Following nearly a decade of hard-fought litigation and extensive discovery, including depositions of more than 50 fact witnesses, depositions of 16 expert witnesses, and the production of approximately 45 million pages of documents, the case was set for trial on federal securities claims that the District Court found were sufficient to overcome a motion to dismiss, two motions for reconsideration, objections to class certification, a five-day *Daubert* hearing on medical issues, and a summary judgment ruling in which the District Court specifically credited the initial report ("**Report**") and methodology of Plaintiffs' damages expert, Professor Daniel Fischel. SA1-29.[1] After the District Court concluded that Plaintiffs had established

---

[1]    The Joint Appendix is cited "A__," and the Special Appendix is cited "SA__." Throughout this brief, emphasis is added to, and internal citations,

triable issues on each element of their case (*id.*), from which a jury could find a massive securities fraud perpetrated on the Class, the District Court excluded Professor Fischel's testimony in its entirety on *Daubert*[2] grounds and granted summary judgment to Pfizer.

The District Court's preclusion of Professor Fischel's testimony was error. Professor Fischel is a renowned expert who has served as Dean of the University of Chicago Law School, Director of its Law and Economics Program, Professor at both the Chicago and Northwestern Business Schools, and consultant to the Securities & Exchange Commission and the Federal Trade Commission. A2214-15, A2675-2704. His publications have been cited in scores of decisions, including multiple decisions of this Court[3] and the Supreme Court.[4] He has testified in over 50 trials. A2681-2703. He is one of the preeminent experts in the economic analysis of securities fraud damages. In this case, Professor Fischel used a standard "event study" methodology to calculate artificial inflation of Pfizer's stock price during the Class Period by identifying seven "corrective disclosures" revealing adverse

---

quotation marks and brackets are omitted from, quoted material, unless otherwise indicated.

[2]    *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[3]    *E.g.*, *United States v. Allen*, 155 F.3d 35, 42 (2d Cir. 1998).

[4]    *E.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 246 n.24 (1988).

cardiovascular risks associated with Celebrex and Bextra that led to statistically significant declines in Pfizer's stock price. A2222-24, A2226-29. He also deployed a conservative offsetting financial calculation that measured inflation that came into Pfizer's stock price during the Class Period. This offset greatly *benefitted* Pfizer because the inclusion of that inflation *reduced* overall damages. A2229-31. The methodology of his Report was endorsed by Pfizer's expert, Dr. Paul Gompers, who testified that he did not "see any major criticism of [Professor Fischel's] event study." A1645. The District Court relied on Professor Fischel's conclusions for key rulings in orders granting Plaintiffs' motion for class certification and denying Pfizer's first motion for summary judgment. A382, A402-04, SA17-21.

Pfizer's motion *in limine* did not challenge any aspect of Professor Fischel's principal submissions—his Report of nearly 500 pages of analysis and exhibits—or the underlying event study methodology. A2214-2709. Instead, Pfizer challenged a half-page Supplemental Report, timely submitted pursuant to Rule 26(e)(2), in which Professor Fischel conformed his calculations to conclusions reached by the District Court in its first summary judgment opinion. A2711. On summary judgment, the District Court ruled that two of the disclosure events included in Professor Fischel's

3

event study were not corrective disclosures because they did not reveal a previously undisclosed risk. SA18-22. Professor Fischel therefore adjusted his calculations to remove the artificial inflation attributable to those events—a change requiring a single sentence of text and affecting a small fraction (9.7%) of the total inflation. A2711.

Pfizer argued that while Professor Fischel should have removed from his analysis the artificial inflation attributable to the two dismissed corrective disclosures—as he did—he should not have taken the additional step of calculating a proportionate decrease in effecting his Pfizer-friendly offset. A1484-85, A2136. Pfizer's expert, Dr. Gompers, cited no authority discrediting Professor Fischel's proportionate adjustment. A2761-91. Pfizer also complained that Professor Fischel failed to "disaggregate" inflation from a handful of statements by non-party Pharmacia Corporation (**"Pharmacia"**) ruled unattributable to Pfizer. A2761-91. Since Professor Fischel's event study had not attributed any inflation to those statements in the first instance, the objection was meritless and required no adjustment. A2483-2599, A2180-83.

Professor Fischel's revised calculation was precisely that—a calculation, not a revised methodology. It was an extension of the unchallenged principles governing his event study and Report. The

4

Supplemental Report was entirely dependent on that foundation and did not vary or retract any of it. The District Court nonetheless found that Professor Fischel's revised calculation was "not … shown to be the product of reliable principles and methods reliably applied." SA31. The Court also faulted Professor Fischel for failing to explain why the Court's dismissal of claims based on some Pharmacia statements did *not* alter his opinion, even though Rule 26(e) does not require an expert to account for intervening events that have no impact on the expert's opinion, and the dismissed Pharmacia statements were not a predicate to any inflation in his analysis. SA31. Although the Court's ruling did not impugn any of the analysis or the methodology in Professor Fischel's original Report, the Court precluded him from testifying *at all*. SA32.

Plaintiffs promptly sought leave to file an Amended Supplemental Report in which, among other things, Professor Fischel explained that Pfizer's alternative approach, while omitting any proportionate reduction of the Pfizer-friendly offset in Professor Fischel's original Report, was compatible with the methodology of his Report—it simply failed to resolve all implications of the Court's ruling that he perceived. A2176-80. Consequently, Professor Fischel concluded that he could use Pfizer's approach as an "appropriate alternative" that conformed to his methodology,

if the Court continued to reject his preferred approach. A2179-80. <u>There was, therefore, an adjustment on which the parties could agree for the jury to consider, and it eliminated all *Daubert* objections</u> concerning how to address the two, eliminated corrective disclosures.

Two months before the scheduled trial date, the District Court denied Plaintiffs' motion and entered judgment for Defendants. SA33-40. The Court thus barred Professor Fischel from testifying within limits that he <u>and</u> Pfizer both found acceptable, reasoning that "[t]he Court is not … an economist, and Professor Fischel's offer to permit the Court to select which of two putatively valid inflation determination methodologies to present to the jury plainly demonstrates that the proffered testimony is not deserving of an 'expert opinion' label." SA36. The choice between competing experts, however, is a matter for the jury.

The prejudice to Plaintiffs in this 10-year-old certified class action is catastrophic, utterly disproportionate to the dispute over Professor Fischel's post-summary-judgment adjustments, and particularly unsustainable in light of Professor Fischel's adoption of Pfizer's approach as an acceptable alternative. Barring Professor Fischel's testimony in its entirety left Plaintiffs without any remedy for what the District Court has concluded are actionable and serious misrepresentations that a jury could conclude caused

considerable damage to the Class based on an <u>undisputed</u> adjustment. All other errors aside, at a minimum, the District Court should have permitted Professor Fischel to testify within limits that Pfizer itself had agreed were permissible.

## JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §1331. Plaintiffs timely appealed from a final judgment of the District Court dated July 9, 2014. A2863-66. This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

1.      Whether the District Court erred in excluding Plaintiffs' damages expert when the only aspect of the expert's testimony in question was a report that conformed a calculation, made pursuant to an otherwise unchallenged methodology, to factual conclusions reached by the District Court in a summary judgment ruling, and where the expert agreed to use an alternative adjustment proposed by Defendants if the Court rejected his preferred approach.

2.      Whether the District Court abused its discretion in excluding all of the testimony of Plaintiffs' qualified damages expert, resulting in dismissal of a certified class action, on the ground that the expert's Supplemental Report—submitted only as a consequence of the Court's

7

summary judgment ruling—was "untimely," when the supplement, and a proposed amendment to it, were submitted promptly in response to the Court's ruling, violated no discovery rule or order, caused no prejudice to Defendants, and threatened no delay in trial.

     3.     Whether the District Court erred in granting summary judgment to Pfizer on claims arising from third-party statements when there was record evidence from which a jury could conclude Pfizer had ultimate authority over those statements.

<u>**STATEMENT OF THE CASE**</u>

This securities fraud action seeks damages on behalf of a certified class of investors who purchased or acquired Pfizer stock between October 31, 2000, and October 19, 2005 (the "**Class Period**"). A157, A376-407. The initial complaint was filed on December 15, 2004, and consolidated with 28 related actions. ECF 1, ECF 37. Lead Plaintiff Teachers' Retirement System of Louisiana filed a consolidated class action complaint ("**CCAC**") on February 16, 2006 (ECF 51), and an amended consolidated class action complaint ("**ACCAC**") on March 27, 2012. A153-375. Defendants were Pfizer, Inc. and senior Pfizer officers (the "**Individual Defendants**") (together with Pfizer, "**Defendants**" or "**Pfizer**"). A170-78.

Plaintiffs appeal from the following decisions of Hon. Laura Taylor Swain of the United States District Court for the Southern District of New York:

1.  An Opinion dated March 28, 2013, granting Pfizer partial summary judgment on claims arising from statements released by Pharmacia but which, Plaintiffs contend, Pfizer had ultimate authority over (SA1-29).

2.  An Order dated May 21, 2014, granting Defendants' Motion *in limine* and precluding Plaintiffs' expert from testifying (SA30-32).

3.  A Memorandum Order dated July 8, 2014, denying Plaintiffs' motion for leave to amend their expert report and granting Defendants' motion for summary judgment (SA33-38).

## A.  Factual Background.

The actions assert federal securities law claims based on Defendants' fraudulent misrepresentations and omissions about the safety of two of Pfizer's pain-relieving drugs, Celebrex (celecoxib) and Bextra (valdecoxib). A159. Celebrex and Bextra are part of a class of drugs known as Cyclooxygenase 2 ("**COX-2**") inhibitors, a sub-class of non-steroidal anti-inflammatory drugs. SA5. Pfizer described Celebrex as "the most successful

drug launch in the history of the pharmaceutical industry." A833-34.[5] In 2004 alone, Celebrex and Bextra's combined revenue was $4.5 billion. A662.

Celebrex and Bextra were developed by G.D. Searle & Co. ("**Searle**"), which was acquired by Pharmacia in July 1999. ECF 381 at 4, ECF 419 at 12-13. Pfizer acquired Pharmacia, including all of its interest in Celebrex and Bextra, in April 2003. ECF 381 at 5, ECF 419 at 13. Pfizer previously had a co-promotion agreement regarding Celebrex and Bextra, first with Searle and then with Pharmacia. ECF 381 at 5, ECF 419 at 13-14.

Plaintiffs adduced evidence that the co-promotion agreement gave Pfizer access to all high-level strategic planning regarding those drugs and a right to review and approve all public statements about them, and the two companies agreed to share profits and losses from their sales. A647-661, 664-66. Pfizer's testimony was that "[t]he ... [co-promotion] agreement required that both companies agree upon anything that was done, in other words, one company would not put out an ad or press release **or anything**

---

[5]    In deciding the motion for summary judgment, the District Court cited evidence in Plaintiffs' Rule 56.1 Statement (ECF 420), to which Pfizer had declined substantively to respond. ECF 406. *See*, *e.g*., SA4, SA10-18. In this brief, as in the District Court's summary judgment opinion, citations to Plaintiffs' Statement incorporate by reference the evidence cited therein. *See* SA4.

independent of the other company." A664. Pfizer and Pharmacia were partners in a "Cox-2 Alliance" (A683), and managed the venture through numerous joint executive committees (A647-52).

Plaintiffs adduced evidence that Pfizer's participation in the co-promotion agreement gave Pfizer, its senior executives, and other Pfizer employees, including senior medical personnel, possession of or access to non-public clinical studies and other non-public data showing that patients using Celebrex or Bextra suffered a significantly increased risk of adverse cardiovascular events. A667-802. As the District Court stated in its first summary judgment decision, this evidence "indicated that Celebrex and Bextra were associated with increased cardiovascular risks, and that the results of the studies were internally recognized by Pfizer senior management, including the Individual Defendants." SA5-6. The Court found that "the record is replete with evidence that Defendants recognized that Celebrex and Bextra had associated cardiovascular risks." SA14.

The evidence showed that Pfizer intentionally concealed material results of numerous clinical studies and made false statements regarding the cardiovascular risks associated with Celebrex and Bextra. A663, A667-822, SA13-16. For example, the minutes of a February 2002 meeting of a joint Pfizer/Pharmacia Working Group record a decision to "embargo[]"

11

publication of a study that led a senior Pfizer physician to conclude that Bextra's "safety profile" looks "very Vioxx-like…."[6] A716, A720-21. That same Pfizer physician previously told Pfizer's management that if there was a question at Pfizer's annual shareholder meeting about whether Pfizer's drugs "have cardiovascular problems like Vioxx?," the response should be: "*do not disclose*." A747-48.

Plaintiffs identified over 70 affirmative misstatements, before and during the Class Period, touting the cardiovascular safety of Celebrex and Bextra. SA10-13; *see* A823-A878. More than 60 were made by Pfizer alone—*i.e.,* not jointly with a co-promoter, or by its employees—before and during the Class Period. *Id.*

On September 30, 2004, Merck announced it was withdrawing Vioxx from the market due to increased cardiovascular risks associated with the drug. A789. On receipt of this news, Defendant McKinnell, Pfizer's CEO, directed Pfizer's senior officers to "move immediately to avoid collateral damage and to exploit what could be a major opportunity…. We need a press release out the door before 9 am making it clear that our clinical studies in

---

[6]     Pfizer viewed Merck Inc.'s drug Vioxx as the biggest competitor of Celebrex and Bextra. A845. Vioxx's increased cardiovascular risk was demonstrated in a clinical study that became publicly-available in early 2000. A193, A207-08, A213, A221-23.

tens of thousands of patients show no signal of cardiovascular complications." A789-80. Despite its knowledge of the studies showing increased cardiovascular risks of Celebrex and Bextra, and its understanding that Bextra's safety profile was "Vioxx-like," Pfizer issued a press release stating:

> The evidence distinguishing the cardiovascular safety of Celebrex has accumulated over years in multiple completed studies, none of which has shown any increased cardiovascular risk for Celebrex.… Bextra's cardiovascular safety profile is also well established in long-term studies.

A790, A795.

The Vioxx withdrawal focused intense media scrutiny on COX-2 inhibitors. Within days of Pfizer's press release touting the cardiovascular safety of Celebrex and Bextra, Pfizer was forced to release results of the early-2004 Bextra study it had been concealing, and a series of corrective disclosures revealed the increased cardiovascular risk associated with Celebrex and Bextra—the very risk that Pfizer had denied throughout (and prior to) the Class Period—causing substantial declines in Pfizer's stock price. A2222-24, A2229, A808-21.

## B. District Court Rulings Recognizing the Strength of Plaintiffs' Claims.

On June 8, 2008, the District Court denied Pfizer's motion to dismiss Plaintiffs' claims under the Securities Exchange Act of 1934, holding that:

13

(i) "the CCAC's allegations are sufficient to plausibly state a claim under Section 10(b) and Rule 10b-5," (ii) "even assuming Section 20(a) requires … heightened pleading [of control person's scienter], Plaintiffs have met the higher standard," and (iii) Plaintiffs adequately pled insider trading under Section 20A. A119-20, A136, A138-39. The Court denied two motions for reconsideration (ECF 98, ECF 355), and a motion for interlocutory appeal (ECF 98). After a five-day *Daubert* hearing in October 2009 involving medical experts, the Court denied Pfizer's motions to exclude. ECF 191, ECF 193.

On March 27, 2012, after reviewing more than 45 million pages of documents and deposing more than 50 fact witnesses, Plaintiffs filed the ACCAC. A145, A153-375. In its March 22, 2012, Order granting leave to file the ACCAC, the Court found, *inter alia*, that "the CCAC adequately pleaded scienter" and the proposed amendment "adequately alleges [that the Individual Defendants] are liable for statements issued in Pfizer press releases." A148, A151. On March 29, 2012, the Court certified the Class (A376-405) (amended on April 6, 2012 (A406-07)), and approved the class notice on July 5, 2012. ECF 390. Notice was sent to millions of Class members in July 2012. ECF 395.

14

By Order of March 28, 2013, the District Court largely denied Defendants' motion for summary judgment, holding that:

- "Plaintiffs have proffered evidence that several studies, conducted between 1998 and 2004, revealed that Celebrex and Bextra were associated with cardiovascular side-effects, and that Defendants were aware of these results" (SA10).

- "Plaintiffs have proffered evidence that Celebrex and Bextra were significant revenue drivers for Pfizer, that the drugs' competition for market share with Merck's Vioxx centered on cardiovascular safety, and that Pfizer was aware that *any* information as to the drugs' cardiovascular safety would be material to investors…" (SA13) (emphasis in original).

- "Plaintiffs have proffered evidence that, during the Class Period, Pfizer and the Individual Defendants knew of, but failed to disclose, the cardiovascular risks associated with Celebrex and Bextra" (SA13-14).

- "[T]he record is replete with evidence that Defendants recognized that Celebrex and Bextra had associated cardiovascular risks, that such risks would be considered

15

material by investors, and that Defendants nonetheless misrepresented and actively concealed these risks." (SA14).

The summary judgment Order relied on Plaintiffs' damages expert, Professor Fischel, whose qualifications were undisputed. SA17-21. Professor Fischel's principal submission was a January 13, 2012, Report opining that exposure of Pfizer's alleged fraud caused Plaintiffs' losses and quantifying the amount of artificial inflation in Pfizer's stock on each day of the Class Period. A2214-2709.

On the basis of Professor Fischel's analysis and record evidence (SA17-18), the District Court found: "in light of [Pfizer's] pre-Class Period alleged misstatements and later drops in Pfizer's stock price, a jury could conclude that Pfizer's stock price was artificially inflated at the beginning of the Class Period." SA18. The Court also endorsed the principle of inflation maintenance: "a misstatement may cause inflation simply by maintaining existing market expectations, even if it does not actually cause the inflation in the stock price to increase on the day the statement is made." SA17.

The Court also relied on Professor Fischel's opinions to conclude that Defendants were not entitled to summary judgment on the issue of loss causation, explaining that "Plaintiffs rely on the 'materialization of the risk' theory, under which a plaintiff must show that 'the alleged misstatement

16

conceals a condition or event which then occurs and causes the plaintiff's loss' [and] [t]he potential cardiovascular side effects of Celebrex and Bextra were the relevant undisclosed risk here." SA18-22.

The Court explained that Professor Fischel had undertaken a statistical analysis, known as an "event study,"[7] to identify certain disclosures revealing cardiovascular risks that led to reductions in the price of Pfizer stock—*i.e.*, materializations of the risk:

> Plaintiffs' expert, Professor Fischel, conducted an "event study," through which he (1) identified seven disclosure events in 2004 and 2005 that revealed adverse cardiovascular risks associated with Celebrex and Bextra; (2) tied those events to statistically significant declines in Pfizer's stock price, and (3) cited market commentary confirming that it was those events—not market forces or nonfraudulent Pfizer-specific news—that caused the price declines.

SA19. The Court credited Professor Fischel's analysis as to five of the challenged disclosure events, holding with respect to each decline that "Plaintiffs have proffered evidence from which a reasonable jury could find that the events notified the public of previously undisclosed cardiovascular risks, and that Pfizer's stock price fell accordingly." SA19-21.

---

[7]  Event studies, which are widely used in securities fraud litigation, are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2415 (2014).

The Court determined, however, that two of the disclosure events (a November 4, 2004 article in Canada's *National Post* and two news articles appearing on October 20, 2005) did not qualify as "materialization of a concealed risk" because they did not reveal any "true risk of Celebrex and Bextra's cardiovascular side effects." SA22.

The Court also held that Defendants could not be held liable for nine misrepresentations issued by Pharmacia prior to its acquisition by Pfizer, but did not preclude Defendants' liability for the *more than sixty* remaining misstatements identified by Plaintiffs. SA27-28.

### C.   Professor Fischel's Event Study and Original Report.

Professor Fischel's event study and Report—on which the District Court relied—used an unchallenged method to determine the extent to which Defendants' misrepresentations inflated the price of Pfizer stock during the Class Period. Professor Fischel derived a "residual" return for each day of the Class Period using a regression analysis that compared historical changes in Pfizer's stock price to a market and industry index, and tested those residual returns for statistical significance. A2226-28. He then isolated statistically significant *decreases* in Pfizer's stock price associated with public statements revealing Pfizer's fraud ("corrective disclosures"). A2228-29.

At that point, quantifying artificial inflation could have been a relatively simple matter of measuring the price decline on each corrective disclosure date—*i.e.,* dates on which inflation came out of the Pfizer stock price—and working backwards from the last day of the Class Period to calculate how much inflation was in the stock prior to the corrective disclosure. This is an accepted method known as "backcasting." *Goldberg v. Household Bank, FSB*, 890 F.2d 965, 966-67 (7th Cir. 1989) ("[T]he drop when the truth appears is a good measure of the value of the information, making it the appropriate measure of damages.").[8]

Professor Fischel further refined his analysis, however, to give Pfizer the benefit of fraud-related price *increases* during the Class Period where the circumstances of the associated public statements ("offsetting disclosures") indicated some mitigating factor. A2229-31, A568. This conservative approach, rarely used by plaintiffs' experts, greatly benefited Pfizer, since Professor Fischel reduced the inflation attributable to the corrective disclosures by the amount of the offsetting disclosures for each day preceding the offsetting disclosure. Pfizer concedes that this substantially

---

[8]    In *Halliburton*, the Supreme Court recently cited with approval an amicus brief discussing the backcasting method. *See* 134 S. Ct. at 2415.

reduced the damages calculable from Professor Fischel's event study. *See* A1473.

The analysis identified seven corrective disclosures and five offsetting disclosures concerning the cardiovascular risks of Celebrex and Bextra, from which Professor Fischel quantified the artificial inflation present in Pfizer stock on each day of the Class Period. A2228-32, A2602-35. Professor Fischel supported his conclusions with hundreds of pages of analysis and exhibits. A1939-2126, A2214-2709. He was deposed extensively by Pfizer's counsel in October 2011, May 2012, and June 2013.

Pfizer's expert, Dr. Gompers, found no flaws in Professor Fischel's methodology, which Dr. Gompers described as a "typical daily event study." A1643. Dr. Gompers did not do his own event study because, as he testified, "*I didn't see any problem with Fischel's event study*." A1688. Dr. Gompers testified that "one might quibble a little bit" with Professor Fischel's industry index, but he had "no other quibbles with his calculation of the residual returns or statistical significance." A1645, A1650-51. Dr. Gompers "agree[d]" that "the dates [isolated by Professor Fischel] are statistically significant" (A1688), and "d[id]n't see any problem with the way he calculated his inflation band." A1652. He "verified what Professor Fischel did [and] replicated it to make sure there were no calculation errors."

A1674-75. He agreed there was "academic literature" supporting Professor Fischel's inclusion of positive offsetting disclosures in his event study (A1699), and believed it to be "important to include dates [*i.e.*, the offsetting disclosures] on which … speculation [about corrective disclosures] was revealed to be incorrect." A1699.

### D.    Professor Fischel's Supplemental Report and the Motion *in Limine*.

Following the District Court's first summary judgment ruling, Professor Fischel promptly submitted a brief Supplemental Report under Rule 26(e)(2), revising his calculation of artificial inflation to remove the two corrective disclosures that the Court excluded. A2711. The stock price declines associated with the two disclosures amounted to a mere $0.67 per share, or 9.7% of Professor Fischel's original estimate of $6.88 in total inflation. A2711.

Pfizer fully agreed with Professor Fischel that all artificial inflation derived from price declines on the two excluded dates must be subtracted, and that this would necessarily reduce overall inflation for all prior dates to the beginning of the Class Period: "The Court's elimination of the November 4, 2004 and October 20, 2005 corrective disclosures required Fischel to eliminate the residual price declines on those days from his inflation calculation." A1479.

Pfizer disagreed with two aspects of the Supplemental Report: (1) Professor Fischel's proportional adjustment to capture the necessary reduction of overall inflation, and (2) his determination that no adjustment was necessary with respect to the Pharmacia statements because he had not attributed any inflation to specific Pharmacia statements in the first place.

### (1)    The 9.7% Proportionate Adjustment.

Professor Fischel determined that it was appropriate to adjust the offsetting disclosures by the same 9.7% that he removed from the corrective disclosures. In the Supplemental Report, Professor Fischel explained how this adjustment accounted for the Court's ruling:

> Because eliminating the stock price declines related to Celebrex and Bextra on these dates reduces the total residual stock price decline I estimated related to these drugs … by 9.7 percent, I proportionally reduce the residual stock price increases I measured that are related to these drugs [*i.e.*, the offsetting disclosures]… by 9.7 percent.

A2711.

He concluded that the Court's elimination of dates on which statistically significant price declines occurred required more than simple elimination of the inflation related to those dates. Given the economic relationship between corrective and offsetting disclosures and the "equilibrium principle"—that "if … a court decides that less inflation is coming out of the stock, that also means that less inflation is going into the

stock" (A1110)—simple elimination of the inflation from the two dismissed corrective disclosures was inappropriate. As Professor Fischel explained in his deposition:

> [I]f … a price movement on a particular date were subsequently determined to be attributable to some factor other than cardiac issues relating to Celebrex and Bextra, then it would be perfectly appropriate to eliminate that date … from the calculation of inflation, and not make any other adjustments. If, on the other hand, the date is related to cardiac issues related to Celebrex and Bextra, but ... deemed for whatever legal reason not to be a corrective disclosure, then it's appropriate to eliminate the date; but also to think about the effect of eliminating the date on other calculations of inflation during the class period.

A1109.

Neither Pfizer nor Dr. Gompers cited any economic or other authority discrediting Professor Fischel's proportionate adjustment to offsetting disclosures. When asked how he would have "adjusted for the Court's elimination of two of the corrective disclosures in the March 28, 2013 summary judgment opinion," Dr. Gompers responded: "I don't have an affirmative opinion in terms of how I would have done it." A1680. Moreover, Dr. Gompers concurred in the two essential premises underlying Professor Fischel's adjustment: (i) the connection between corrective and offsetting disclosures ("if you believe that there's speculation or incorrect inferences from a given piece of information, it would be important to

23

include dates on which that speculation was revealed to be incorrect" (A1699), and (ii) the equilibrium principle (it is "correct" that "a change in the total amount of inflation that comes out of Pfizer's stock price must be matched by a change of equal measure in the amount of inflation entering the stock price at some point in time" (A1677)).

In moving to exclude Professor Fischel's testimony, Pfizer advised the Court of Defendants' position as to how to fix the supposed deficiencies in his calculations. According to Pfizer, "the Court's rejection of [the two corrective disclosure] dates simply required [Professor Fischel] to remove them from his estimate of the inflation leaving the stock—by a total of $0.67…." A1475. Defendants argued that:

> Fischel's newly invented 9.7% adjustment to the inflation-entry dates indisputably *increases* implied damages relative to what they would have been had he simply removed the $.67. *It is that adjustment, not the required removal of the rejected dates, that is contested here*.

A2136.

Thus, the matter in dispute was narrow: the precise details of the manner in which to make an arithmetical adjustment to Professor Fischel's calculations (amounting to 9.7% of inflation) to conform to the summary judgment Order. There was no conceptual dispute between the parties over Professor Fischel's event study methodology.

24

### (2)    The Pharmacia Statements.

Pfizer's motion *in limine* also complained that the Supplemental Report did not address nine Pharmacia statements that the District Court held were unattributable to Pfizer. Defendants faulted Professor Fischel for supposedly "assum[ing] Defendants are responsible and can be held liable for *every* alleged misstatement in the complaint." A1478. According to Pfizer, the District Court's ruling "undercut" that assumption, requiring Professor Fischel to "disaggregat[e] inflation allegedly caused by Defendants from that caused by Pharmacia." A1491. That was incorrect.

Professor Fischel never made the sweeping assumption Pfizer claimed (and the Court found) he had made. Rather, the assumption he made was only that: "I assume Plaintiffs will be able to establish at trial that Defendants withheld material information about the cardiovascular safety of Celebrex and Bextra." A2219. There was nothing to disaggregate because Professor Fischel's Report did not attribute any inflation to specific Pharmacia statements. Under Professor Fischel's methodology, inflation was only attributed to statements made during the Class Period and associated with a statistically significant increase in Pfizer's stock price, as was set forth in his Report (A2228-33, A2482-2599), and made explicit at his deposition. *See, e.g.,* A601. A simple cross-reference of Professor Fischel's

25

event study and allegations identifying the excluded Pharmacia statements showed that no Pharmacia statement during the period covered by his study had a statistically significant effect on Pfizer's stock price. *See* SA17, A2482-599, A277-89. Consequently, any supposed "assumption" that all statements were attributable to Pfizer was irrelevant, and there was no reason for Professor Fischel to address the District Court's Pharmacia ruling in his Supplemental Report. As he testified: "[the ruling] did not cause me to modify my analysis in any way." A1119; *see also* A1120.

### E. The District Court's Ruling on the Motion *in Limine* Excluding Professor Fischel's Testimony in Its Entirety.

In a three-page Order dated May 21, 2014, the District Court granted Defendants' motion *in limine* and excluded Professor Fischel's testimony in its entirety. SA30-32.

Disregarding the theory underlying Professor Fischel's inclusion of positive stock price movements during the Class Period (A2169-74), their relation to corrective declines set forth in his initial Report (A2229-31), and his extensive testimony about it in two separate depositions (*e.g.,* A568-69, A574, A1109-17), the Court held that "[n]o explanation of the relationships among the events triggering the respective price decreases and increases was offered, and no research reference or peer review information is cited in support of Fischel's parallel adjustment method." SA31. Consequently, the

26

Court found, "Fischel's 9.7% parallel adjustment has not been shown to be the product of reliable principles and methods reliably applied." *Id.*

The Court also criticized Professor Fischel's failure to "disaggregate … inflation attributable to … statements by Pharmacia" after previously asserting (erroneously) that his "opinions are premised on the assumption that Defendants are responsible for all of the alleged misrepresentations and omissions alleged in the complaint." SA31. The Court found that his "failure to account in any way for the impact of the excluded Pharmacia statements renders his opinions unhelpful to the jury...." SA32. The Court did not mention that Professor Fischel's event study did not indicate any statistically significant inflation from any Pharmacia statement. Nor did the Court acknowledge its prior summary judgment ruling on "inflation maintenance" liability, which was irreconcilable with the Court's new finding. *See* SA17-18.

Although Dr. Gompers had concurred in Professor Fischel's event study methodology, the Court held that "Fischel's expert testimony … fails to meet the standards set by Rule 702." SA32. Finally, although Defendants had made it clear that "[i]t is that adjustment, not the required removal of the rejected dates, that is contested here" (A2136), the Court excluded Professor Fischel's testimony in its entirety. SA32.

27

## F. Defendants Seek a Continuance of the Trial.

At a pre-trial conference on May 23, 2014, the Court granted Plaintiffs permission to move for leave to submit an amended report that would satisfy the concerns the Court expressed in its ruling on the motion *in limine*, and also granted Defendants leave to move for summary judgment on the ground that Plaintiffs were unable to prove damages. A2152-53. Defendants also sought a continuance of the September 9, 2014, trial date to afford time, should Plaintiffs be given the opportunity to submit an amended expert report, for a fourth deposition of Professor Fischel and submission of a fourth rebuttal report by Dr. Gompers. A2153. When the Court offered to adjourn the date for one month, counsel for Pfizer and for Individual Defendant McKinnell both expressed concerns about conflicts with other commitments. A2153-54.

## G. Professor Fischel's Amended Supplemental Report.

Professor Fischel's Amended Supplemental Report showed that his Supplemental Report's 9.7% proportionate adjustments were far from "arbitrary" (A2763), and were thoroughly grounded in the principles underlying his original Report. Professor Fischel articulated the conundrum he had perceived in the District Court's summary judgment ruling: the Court found that the Nov. 4, 2004, and Oct. 20, 2005, disclosures were not

28

"corrective," but did not address or reject the economic evidence of a statistically significant price drop on those dates. SA21-22. In light of the "equilibrium principle" guiding Professor Fischel's analysis from the beginning, the Court's ruling required not only elimination of the artificial inflation when it *went out* of the stock on the excluded dates, it also required consideration of how that inflation had been treated when it *went in*. A2171-74, A2176-77.

Professor Fischel reiterated that there was no one-to-one correspondence between the negative and positive corrective disclosures viewed in isolation, but there was "a direct relationship in the aggregate … between the Pfizer stock price declines and increases that I measured…. [I]f inflation did not come out, it could not have come in earlier … and if the price did not 'overreact' to disclosures related to Pfizer's COX-2 drugs, it could not have 'bounced back' afterward…." A2174. Consequently, Professor Fischel had "concluded that the most reasonable approach … was to reduce the inflation attributable to each positive disclosure … proportionally." A2176-79.

In an abundance of caution, Professor Fischel also demonstrated, and accepted, an "appropriate alternative" of removing the price declines associated with the two dismissed corrective disclosures without making the

parallel proportionate adjustment—an alternative he showed was consistent with standard backcasting methodology used in his original Report and was supported by the literature—should the Court disagree with his reliance on a theory of proportionate adjustment based upon the aggregate relationship. A2179-80. That alternative was identical to Pfizer's proposed removal of the price declines associated with the two corrective disclosures without adjusting the offsetting disclosures. A1475. Hence, there was an approach to the Court's ruling in which both parties concurred.

Finally, Professor Fischel explained why the Court's ruling on the Pharmacia statements had no effect on his analysis:

> Because none of the eight dismissed Pharmacia statements during the Class Period … were associated with statistically significant residual increases in Pfizer's stock price … there was no basis to include them in my analysis and thus no need to adjust my true value line due to their dismissal.…

> Pfizer's and Pharmacia's statements prior to the beginning of the Class Period, as well as other publicly available information from multiple potential sources, created positive expectations about the cardiovascular safety of Pfizer's COX-2 drugs. However, what caused Pfizer's stock price to be artificially inflated during the Class Period is that the allegedly false expectations were allowed to remain reflected in the Company's stock price.

A2180-83.

The Amended Supplemental Report was descriptive. It demonstrated the links between Professor Fischel's Supplemental Report and his prior

testimony. Except for Professor Fischel's proposed alternative—which was identical to Pfizer's suggested approach—everything in the Amended Supplemental Report had been thoroughly explored in Professor Fischel's depositions.

### H. The District Court's Order Granting Summary Judgment to Pfizer.

In its July 8, 2014 Order, the Court rejected Professor Fischel's proposal to adopt Pfizer's treatment of the excluded corrective disclosures as an acceptable alternative to his own: "The Court is not … an economist, and Professor Fischel's offer to permit the Court to select which of two putatively valid inflation determination methodologies to present to the jury plainly demonstrates that the proffered testimony is not deserving of an 'expert opinion' label. The third supplemental's proffered damages analysis does not meet the standard of Rule 702." SA36.

The Court also rejected Professor Fischel's explanation of his treatment of the Pharmacia statements, which was corroborated by his initial Report, crediting, instead, a Pfizer argument that misrepresented Professor Fischel's deposition testimony: "[Professor] Fischel, who previously disclaimed any separate analysis of the impact of the excluded Pharmacia statements and testified at his deposition that the jury would have to adjust his methodology in some unspecified way to disaggregate their effect from

31

that of statements for which Defendants can be held liable, now claims that he had a different view all along." SA36.

The Court refused to consider Plaintiffs' argument that disaggregation of the Pharmacia statements was not required, even though it had previously endorsed in its summary judgment Order the concept that Pfizer could be liable for misstatements that merely maintain inflation already in its stock price. SA17. The Court stated it was "unnecessary for the Court to resolve this dispute, since the damages analyses on which it centers are neither timely proffered nor sufficient to meet Rule 702 requirements." SA37.

The Court grounded its decision in "considerations of judicial economy," based on the conclusion that the Amended Supplemental Report contained "additional contextual and explanatory information that the expert had thought unnecessary to disclose during the initial and supplemental rounds of expert disclosures and depositions." SA34-35. This was error:

- The Amended Supplemental Report contained no inappropriate "additional explanations and contextual information." SA35. The substance of Professor Fischel's opinion had been presented and vetted in years of pretrial proceedings, including in three extensive depositions. The central purpose of the Amended Supplement was to demonstrate that very point.

Pfizer had a full and fair opportunity to explore Professor Fischel's post-summary judgment adjustment in his third deposition to whatever extent it wished to do so.

- The Amended Supplemental Report could not fairly be viewed as "untimely" (SA35), because its timing was solely the product of the Court's summary judgment ruling. The Supplemental Report it amended had been submitted promptly after the summary judgment order, in accordance with Rule 26(e)(2), and the Amended Supplemental Report was prepared and submitted within two weeks of the Court's ruling on the motion *in limine*.

- The "defense" did not need "an opportunity to depose [Professor] Fischel on it" (SA36), since he had already submitted to three separate depositions covering all of the material it contained; there was ample time for another deposition, and Plaintiffs did not object to any request for a continuance if Defendants wanted a fourth deposition.

- There was ample cushion built into the trial schedule because the parties had contemplated supplemental proceedings in the summer 2014 to address the implications of the Supreme

33

Court's anticipated decision in *Halliburton*. A2143-45. That proved unnecessary, permitting an additional deposition of Professor Fischel within the existing schedule.

- Were Pfizer to demonstrate a need for additional time, there was no conceivable prejudice from adjournment of the trial date, which Pfizer itself had already sought. A2153. *See* SA36-37.

The District Court recognized that the inability "to proffer admissible loss causation and damages evidence is fatal to Plaintiffs' claims" and granted summary judgment to Pfizer. SA37.

## SUMMARY OF ARGUMENT

1.      The District Court erred in excluding all of Professor Fischel's testimony for failure to satisfy Rule 702 and *Daubert.* Professor Fischel's qualifications were undisputed. His principal Report used a well-established methodology that was unchallenged, and the Court had already relied on his conclusions in certifying the class and denying Defendants' motion for summary judgment. Defendants objected only to (i) an adjustment Professor Fischel made to conform his conclusions to facts determined by the Court in its summary judgment ruling, and (ii) Professor Fischel's failure to address a second aspect of the summary judgment ruling concerning Pharmacia.

34

a. The adjustment was derived entirely from the principles guiding Professor Fischel's unchallenged Report and was not a new methodology requiring separate *Daubert* review.

b. At a minimum, Professor Fischel should have been allowed to testify based on an alternative calculation proposed by Defendants, which was consistent with his methodology, as he proposed to do.

c. Professor Fischel was not required to address the Court's Pharmacia-related summary judgment ruling because it was irrelevant to his calculations, under the maintenance theory of inflation the District Court had endorsed in its summary judgment Order.

2. The exclusion of Professor Fischel, Plaintiffs' sole damages expert, was an abuse of discretion. Professor Fischel's Supplemental Report was timely, and any undue brevity was cured in his equally timely Amended Supplemental Report. Plaintiffs had not contravened any discovery rule or order. Exclusion of Professor Fischel required dismissal of a certified class action after ten years of litigation in which the District Court repeatedly recognized the strength of Plaintiffs' claims. The supplemental reports did

35

not threaten any prejudice to Defendants, who had already deposed Professor Fischel three times, and there was time for a fourth deposition if one was desired. Defendants themselves had already sought an adjournment of the trial date.

3.      The District Court erred in granting Pfizer summary judgment on claims arising from certain Pharmacia statements when there was evidence that Pfizer exercised ultimate authority over those statements.

## STANDARD OF REVIEW

"The district court's interpretation of the Federal Rules of Evidence is given plenary review." *Hathaway v. Coughlin*, 99 F.3d 550, 555 (2d Cir. 1996). An order precluding expert testimony is reviewed for abuse of discretion. *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 212-13 (2d Cir. 2009). A "district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996). *See also Leung v. N.Y.U.*, No. 13-2267-cv, 2014 WL 5137526, at *1 (2d Cir. Oct. 14, 2014) ("A district court abuses its discretion when its decision: (1) rests on an error of law or a clearly erroneous factual finding; or (2) cannot be found within the range of permissible decisions."). The District Court's grant of partial summary judgment to Pfizer in the March 2013 Opinion, on claims arising from the Pharmacia statements, is

36

reviewed "*de novo*, drawing all reasonable inferences and resolving all ambiguities in favor of [Plaintiffs]." *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013).

## ARGUMENT

## I. THE SUPPLEMENTAL AND AMENDED SUPPLEMENTAL REPORTS SATISFIED RULE 702 AND *DAUBERT*.

Professor Fischel's proposed testimony was reliable. His qualifications were undisputed. His event study methodology was well-established. "[E]vent studies are a common method of establishing loss causation, used routinely in the academic literature to determine whether the release of particular information has a significant effect on a company's stock price.… The methodology of event studies has been sustained by many circuits." *FindWhat Investor Grp. v. Findwhat.com,* 658 F.3d 1282, 1313 & n.31 (11th Cir. 2011). Pfizer's expert agreed with it. The District Court itself had relied on Professor Fischel's opinions on market efficiency, materiality, transaction causation, loss causation, and artificial inflation. *See* A376-405, SA1-SA29.

Pfizer's objection to Professor Fischel's narrow, technical adjustment—necessitated by the Court's summary judgment ruling—presented a paradigmatic "battle of the experts" for the jury. *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995). "Where two

37

credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable." *City of Pomona v. SQM N. Am. Corp.,* 750 F.3d 1036, 1049 (9th Cir. 2014).[9]

This Court has not hesitated to reverse district court exclusions of expert testimony under *Daubert* when, as here, a "district court overstepped the boundaries of the role contemplated by *Daubert* and inappropriately usurped the role of the jury." *Joint E. & S. Dist.*, 52 F.3d at 1126. *See Iacobelli Constr., Inc. v. Cnty. of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994) (reversing). Exclusion of expert testimony is a "drastic remedy." *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94-cv-5587, 2002 WL 31780188, at *3 (S.D.N.Y. Dec. 11, 2002). *Daubert* contemplates "liberal admissibility standards," *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002), and "reinforces the idea that there should be a presumption of admissibility of evidence." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995).

---

[9]     *See also Alaska Rent-a-Car, Inc. v. Avis Budget Grp., Inc.,* 738 F.3d 960, 969-70 (9th Cir. 2013) ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."); *Lapsley v. Xtek, Inc*., 689 F.3d 802, 805 (7th Cir. 2012) ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy….").

### A. The 9.7% Adjustment in Professor Fischel's Supplemental and Amended Supplemental Reports Was Not the Product of a New Methodology.

The District Court erred in treating Professor Fischel's Supplemental Report and his Amended Supplemental Report as separate expert opinions that were required to satisfy *Daubert* and Rule 702 on their own, complete with research references and peer-reviewed literature, without reference to his initial Report. There was no basis for holding that Professor Fischel's 9.7% adjustment of artificial inflation had "not been shown to be the product of reliable principles and methods reliably applied." SA31. Professor Fischel's Supplemental Report merely extended the analysis of his unchallenged Report to accommodate the Court's elimination of two events he had identified as corrective disclosures. *See* pp. 4-5, 22-23, *supra.* Pfizer's expert endorsed the principles Professor Fischel identified as guiding the analysis in his Supplemental Report—the "equilibrium principle" and the relationship between corrective and offsetting disclosures. A1109-10, A1677, A1699.

The District Court found no flaw in Professor Fischel's underlying methodology, his use of an event study, and found it established substantial artificial inflation and causation. SA1-29. Pfizer never challenged the event study methodology—its expert endorsed it (*supra* p. 20-21). The Supreme

Court approved event studies in *Halliburton*, 134 S. Ct. at 2415. *See also* Sanjai Bhagat & Roberta Romano, *Event Studies and the Law*, *Part I*, 4 AM. L. & ECON. REV. 141, 142 (2002) ("The event study methodology is well accepted and extensively used in finance.").

Nothing in Rule 26(a)(2)(e) or 26(e)(2) suggests that an expert's "supplement[al]" disclosures must independently satisfy *Daubert* without reference to the work they supplement. The Supplemental and Amended Supplemental Reports fully satisfy *Daubert* when viewed, as they must be, as part of the event study.

The focus of a *Daubert* inquiry "must be solely on principles and methodology, not on the conclusions that they generate," under the "liberal thrust" of the Federal Rules of Evidence. *Daubert*, 509 U.S. at 595, 588. An expert's judgment about application of an approved methodology does not change the fundamental reliability of an expert's testimony. *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 374-76 (5th Cir. 2004) (affirming admission of supplemental report applying methodology to different inputs); *see Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (reversing exclusion of regression analysis based dispute about data rather than methodology); *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013) ("[T]he selection of the variables to include in a regression analysis is normally a

40

question that goes to the probative weight of the analysis rather than to its admissibility."); *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 764-68 (7th Cir. 2013) (abuse of discretion to exclude expert testimony, including supplemental expert report submitted one month before trial and deemed untimely, because uncertainty surrounding the expert's selection of data inputs was for the jury to resolve).

When a methodology is reliable, an expert's rational extrapolations and revisions do not require independent "research reference" or "peer review information," as the District Court required. *See* SA31. This Court has held that *Daubert* does not require "an expert [to] back his or her opinion with published studies that unequivocally support his or her conclusions" and even permits an expert to use "a hybrid of two widely used methods." *Amorgianos*, 303 F.3d at 266. A "*Frye*-like bright-line standard … excluding expert testimony not backed by published (and presumably peer-reviewed) studies … would be at odds with the liberal admissibility standards of the federal rules and the express teachings of *Daubert*." *Id.* at 267. Nor do case-specific adjustments to an established methodology require explicit support in the literature. *See In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-cv-5571, slip op. at 7 (S.D.N.Y. Aug. 12, 2009) ("at a certain level of generality, there is ample precedent for [the] method [applied]. The fact that

41

it lacks precedent at more specific levels does not disqualify it provided the method is applied with sufficient rigor.") (A1865); *Carpenters Health & Welfare Fund v. Coca-Cola Co*., No. 00-cv-2838, 2008 WL 4737173, at \*2 (N.D. Ga. Mar. 14, 2008) ("Defendants do not challenge the methodology of using an event study … they simply quibble regarding the choice of variables. The gatekeeping function of the Court must focus on the underlying methodology rather than the application of the methodology.").

Other Circuits agree that a district court abuses its discretion by excluding expert testimony based on objections to details of an expert's calculations rather than underlying methodology. *E.g., Apple Inc. v. Motorola, Inc*., 757 F.3d 1286, 1325-26 (Fed. Cir. 2014); *In re Se. Milk Antitrust Litig*., 739 F.3d 262, 280-83 (6th Cir. 2014); *Andler v. Clear Channel Broad., Inc*., 670 F.3d 717, 728-29 (6th Cir. 2012); *Milward v. Acuity Specialty Prods. Grp., Inc*., 639 F.3d 11, 22 (1st Cir. 2011). "This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267.

*Daubert* recognized that "[s]ome propositions ... are too particular, too new, or of too limited interest to be published." 509 U.S. at 593. Pfizer's

42

expert admitted that the particulars of Professor Fischel's adjustment were unlikely to be a peer-reviewed topic. Dr. Gompers testified that the economic literature does not address stock price movements "within the context of damages or litigation analysis." A1672. As "far as [Gompers was] aware, there's never been a single paper published in a top-tier peer-reviewed academic finance or economics journal on the subject [of] damages calculations in the context of securities litigation" (A1702-03), and "in most securities litigation, there aren't intraclass [period] inflationary statements made"—*i.e.*, offsetting disclosures—which need to be taken into account. A1706.

Defendants' objections to Professor Fischel's calculations were classic "quibble[s] regarding the choice of variables." *Carpenters Health & Welfare Fund,* 2008 WL 4737173, at *2. The issue went to weight, not admissibility. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). Because the District Court applied the wrong legal standard in excluding Professor Fischel's testimony, its error was an abuse of discretion as a matter of law.

### B. Choosing Between "Putatively Valid" Alternatives Was Not the Role of the District Court.

The Supplemental Report was prompted by the District Court's ruling that two of the events Professor Fischel identified as corrective disclosures

43

did not represent a "materialization of risk." SA21-22. The Court did not deny his evidence of a statistically significant price response to the disclosures, or attribute that drop to a non-fraud related event. *See* SA22. Nor did Pfizer's own expert. A1666, A1668. Professor Fischel's Supplemental Report appropriately sought to eliminate the inflation on the excluded corrective disclosure dates, as required by the Court, in a manner consistent with the methodology of his Report, including the "equilibrium principle" and relationship between corrective and offsetting disclosures.

The District Court erred in disregarding that unchallenged foundation when it granted Pfizer's motion *in limine*. SA31. It compounded the error when it rejected an Amended Supplemental Report that provided the "explanation of the relationships among the events triggering the respective price decreases and increases" the Court had previously found lacking. *Id*. The Court's characterization of that explanation as "additional contextual and explanatory information that the expert had thought unnecessary to disclose during the initial and supplemental rounds of expert disclosure and depositions" (SA34) is unfair. The material was in Professor Fischel's Report and discussed in two separate depositions. *See, e.g.,* A2228-31, A568-69, A574, A1109-17.

44

Even more glaring was the District Court's rejection of the Amended Supplemental Report for suggesting that Pfizer's calculation—elimination of 9.7% of the inflation without Professor Fischel's corresponding adjustment of offsetting disclosures—was an "appropriate alternative" to which Professor Fischel could testify. A2179-80. The Court's rationale—that "[t]he Court is not … an economist" in a position to "select [between] two putatively valid inflation determination methodologies" (SA36)—was contrary to settled law that "[e]xperts are allowed to posit alternate models to explain their conclusion." *Walker v. Soo Line R.R.*, 208 F.3d 581, 589 (7th Cir. 2000) (reversing jury verdict because District Court refused to allow expert testimony); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-21 (7th Cir. 2000) (same; reversing exclusion of expert and dismissal of case); *Auto-Owners Ins. Co. v. Uniden Am. Corp.*, 503 F. Supp. 2d 1087, 1095-96 (E.D. Wis. 2007) (same). An expert has been permitted "to discuss [as many as] eight models of damage calculations with a range of estimates." *John Morrell & Co. v. Local Union 304A, United Food & Commercial Workers, AFL-CIO*, 913 F.2d 544, 559 (8th Cir. 1990).[10]

---

[10]    *See*, *e.g.*, *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 13 F. Supp. 2d 430, 441 (S.D.N.Y. 1998) (expert "used two methods" to determine number of unauthorized sales); *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1139-40 (N.D. Cal. 2010) (expert's damages

45

Professor Fischel should have been permitted to present both alternatives to the jury. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. It is decidedly *not* the province of the judiciary to substitute for the adversarial process; "[s]uch an inquiry would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury." *McCullock*, 61 F.3d at 1045.

Even if the Court had valid reasons to reject Professor Fischel's preferred approach (and it did not), *Daubert* provides no basis for rejecting the agreed alternative. At a minimum, Professor Fischel should have been allowed to present the alternative on which both sides could agree.

## C. Professor Fischel Was Not Required to "Disaggregate" Inflation Attributable to Pharmacia Statements Because He Never Attributed Inflation to Them.

The District Court erred in faulting Professor Fischel for failing to "make any adjustments or otherwise disaggregate his computations to identify any stock price inflation attributable to the dismissed claims that

_____

calculations involved "two different methods" for overdraft fee reversals), *rev'd in part on other grounds*, 704 F.3d 712 (9th Cir. 2012); *Whiteside Biomechanics, Inc. v. Sofamor Danek Grp., Inc.*, 88 F. Supp. 2d 1009, 1020

were based on statements by Pharmacia….” SA31.[11] It was demonstrable as a matter of fact that Professor Fischel’s event study did not attribute any inflation to Pharmacia statements during the Class Period. Disaggregation of Pharmacia’s single pre-Class Period statement from Pfizer’s nine was unnecessary as a matter of law under the “inflation maintenance” theory that the Court properly endorsed in its first summary judgment Order. SA17. The Court compounded its error by crediting Pfizer’s patently infirm argument that Professor Fischel had changed his position. SA31, SA36.

Rule 26(e)(1) requires supplementation only if “the party learns that in some material respect the disclosure or response is incomplete or incorrect.” Professor Fischel testified reliably and consistently that the District Court’s Pharmacia ruling did not affect his analysis, demonstrating that he was under no legal obligation to make that point in a Supplemental Report. Even if there had been inconsistencies, they would have provided grist for cross-examination rather than wholesale exclusion of his testimony.

---

(E.D. Mo. 2000) (“Defendant’s damages expert outlined two methods for calculating damages in the event of liability”).

[11]    The District Court later contradicted itself and stated that it was “unnecessary to resolve this dispute.” SA37.

1.   **Professor Fischel's Analysis Was Not Predicated on Any "Assumption" Affected by the Pharmacia Ruling.**

In granting Pfizer's motion *in limine*, the District Court credited Pfizer's demonstrably infirm argument that Professor Fischel must have attributed inflation caused by Pharmacia to Pfizer because he "asserted in his prior report and in deposition testimony that his stock inflation opinions are premised on the assumption that Defendants are responsible for all of the alleged misrepresentations and omissions alleged in the complaint." SA31. Professor Fischel did not testify on deposition that he assumed Defendants were responsible for <u>all</u> the misstatements in the complaint. The Court cited to a nonexistent assumption. Professor Fischel did not assume that Defendants are responsible for *all* the misstatements in the complaint, but rather, as previously noted, that "Plaintiffs will be able to establish at trial that Defendants withheld material information about the cardiovascular safety of Celebrex and Bextra from at least the beginning of the Class Period." A2219. Thus, the Court relied erroneously on a nonexistent assumption in precluding on this ground. *See United States v. Mimms*, 43 F.3d 217, 221 (5th Cir. 1995) (abuse of discretion where district court erroneously assessed the evidence based on "a misinterpretation of the expert's testimony").

48

The assumption Professor Fischel actually made did not require revision of the Report's conclusions because the Court's dismissal of claims based on certain Pharmacia statements changed nothing with respect to the materiality of information about cardiovascular safety that was being concealed by contemporaneous Pfizer statements.

What Professor Fischel did testify to, repeatedly, was that the dismissal of the Pharmacia statements "did not cause me to modify my analysis in any way." A1119; *see also* A1120. Pfizer's argument rested on the false premise that Professor Fischel had found any Pharmacia statement to be relevant to his analysis. Professor Fischel's Report showed, dispositively, that he had not. His methodology "attributed inflation" only to those statements associated with a statistically significant price increase during the Class Period. A2226-32. The most rudimentary cross-reference of Professor Fischel's event study with the allegations identifying the excluded Pharmacia statements demonstrates that Professor Fischel had not associated any statistically significant increase in Pfizer's stock price with any of the excluded Pharmacia statements. *See* SA27-28, A2482-599, A277-89. The excluded statements had no bearing on his analysis, and any supposed "assumption" that they were attributable to Pfizer was immaterial.

Thus, contrary to the Court's finding, there was no need for Professor Fischel to modify his initial opinion because nothing he had assumed with respect to it had changed.

### 2. Professor Fischel's Amended Supplemental Report Was Not Inconsistent with His Prior Testimony.

The District Court similarly erred in crediting Pfizer's argument that Professor Fischel's Amended Supplemental Report was inconsistent with his prior testimony and in excluding the supposedly "new" disclosure: "Even if this position is soundly grounded in reliable economic principles, this new disclosure is not insignificant and … the defense did not have an opportunity to depose Professor Fischel on it…." SA36.

First, the District Court's conclusion that Professor Fischel's Amended Supplemental Report contradicted prior testimony about Pharmacia statements is incorrect. At Professor Fischel's deposition, Pfizer's counsel tried to elicit hypothetical testimony about "disaggregation" of inflation at the beginning of the Class Period if the Court concluded that a non-defendant was partially responsible for it. A1121. After answering (subject to counsel's objection), Professor Fischel clarified that his answers were about an entirely different issue: a jury's hypothetical exclusion of a "particular *corrective disclosure*." A1121. The District Court overlooked this clarification. There was no inconsistency between Professor Fischel's

testimony and the fact that "he did not disaggregate the effect of the excluded Pharmacia Statements because the Pharmacia statements had no statistically significant impact on Pfizer stock prices." SA36.

Moreover, the Amended Supplemental Report did nothing more than point to the backcasting, statistical analysis, theory of materiality, and absence of any attribution of inflation to a Pharmacia statement that were set forth in a Report that had been available to Pfizer for three years, and explored at length in two depositions. A2176-83, A2219-33, A2482-2599, A2602-35, A1100-25, A558-618. The Pharmacia ruling itself was the topic of the very testimony on which Pfizer based its argument—testimony in which Pfizer pointedly refrained from asking the obvious and only relevant question: had any of the excluded Pharmacia statements played a role in Professor Fischel's analysis?

### 3. Plaintiffs' Inflation Maintenance Claim Required No "Disaggregation."

The issue of "disaggregating" inflation stemming from the dismissed Pharmacia statements was misconceived by the District Court. Plaintiffs brought an "inflation maintenance" claim, under which it is unnecessary to determine which of the more than fifty Class Period statements by Pfizer, compared to the dismissed Pharmacia Class Period statements, maintained inflation that was present at the beginning of the Class Period. A271, A277,

51

A281-82, A288-89. Professor Fischel's event study showed that inflation existed at the beginning of the Class Period and did not increase from an offsetting disclosure until Pfizer responded to the withdrawal of Vioxx in August 2004 by touting the safety of Celebrex. A2229-30.

The Court recognized in its first summary judgment Order (relying in part on Professor Fischel) that "a jury could conclude that Pfizer's stock price was artificially inflated at the beginning of the Class Period" (SA18), and endorsed the theory of inflation maintenance: "a misstatement may cause inflation simply by maintaining existing market expectations, even if it does not actually cause the inflation in the stock price to increase on the day the statement is made." *Id.* at 17. *See also McIntire v. China MediaExpress Holdings, Inc.*, No. 11-cv-0804, 2014 WL 4049896, at *13 (S.D.N.Y. Aug. 15, 2014) ("A material misstatement can impact a stock's value either by improperly causing the value to increase *or* by improperly maintaining the existing stock price.").

Where claims are based on inflation maintenance, a plaintiffs' expert is not required to "quantify the exact impact that each statement had on the inflation." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 562 (S.D.N.Y. 2011). The *Vivendi* Court explained:

> The "maintenance" theory of inflation simply reflects the reality that inflation in a company's stock price is difficult to quantify with mathematical precision in any case, and that in a case where a company repeatedly makes statements that omit information about its liquidity risk, it is reasonable to conclude that each misstatement played a role in causing the inflation in the stock price (whether by adding to the inflation or helping to maintain it), even if it is not possible to quantify the exact impact that each statement had on the inflation.

*Id*.

In *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511 (S.D.N.Y. 2013), plaintiffs' damages expert arrived at the *same* inflation figure found in the *Vivendi* class action, despite the different number of misstatements alleged in the two actions—25 in *Liberty Media* versus 57 in the class action. The Court rejected defendants' objection that the testimony was unreliable because plaintiffs' expert, like Professor Fischel, calculated damages using a backcasting methodology based on the size of the stock price declines following the materialization events. Therefore, independent quantification of inflation caused by each of the 25 misstatements was unnecessary:

> The calculation of damages was not derived from an analysis of the specific effects of individual misrepresentations and omissions. Dr. Nye calculated the damages Liberty suffered as a result of this inflation by analyzing the declines in Vivendi's stock price on the nine days during which the market responded to the materialization of the hidden liquidity risk. Vivendi has offered no legal basis for concluding that this was an

53

unacceptable approach.... Damages need not be proven with mathematical certainty....

*Id.* at 525-26.

Inflation maintenance cases are common. *See*, *e.g*., *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,* 750 F.3d 227, 233-34 (2d Cir. 2014); *Schleicher v. Wendt*, 618 F.3d 679, 683-84 (7th Cir. 2010). The Supreme Court's *Halliburton* decision was an inflation maintenance case. *See* 134 S. Ct. at 2405-06.

Of the ten pre-Class Period statements set forth in the ACCAC, nine were attributable to Pfizer. A271-75. However, it was equally unnecessary for Professor Fischel to "disaggregate" any inflation caused by the single dismissed pre-Class Period Pharmacia statement from the nine Pfizer pre-Class Period statements. In *FindWhat*, the district court had dismissed, as insufficiently pled, two misstatements made prior to the class period and sustained misstatements made during the class period. As here, plaintiffs' expert opined that the stock price was inflated *before* the start of the class period and remained at the same inflated level during the class period, by virtue of the uncorrected pre-class period misstatements. He reasoned that the two dismissed pre-class period statements, while not legally actionable, still caused inflation, which was *maintained* by defendants' subsequent, actionable false statements during the class period. The trial court held that

54

because the expert "testified that the full amount of the alleged price inflation of the stock—26.44%—existed ... more than a year before either of the [actionable class period] statements ... and remained at that level after [such] statements," then these otherwise actionable statements by the defendants could not be responsible for the Plaintiffs' losses. 658 F.3d at 1314.

The Eleventh Circuit reversed, holding that this ruling constituted legal error because the defendants "may be held liable for knowingly making materially false statements that continued to prop up the already inflated price of MIVA's stock and thereby caused losses to investors, *regardless of whether MIVA's stock price was already inflated before the actionable statements were made*." *Id*. at 1307.

Excluding Professor Fischel for failing to "disaggregate" Pharmacia statements was not only error, it was irreconcilable with the District Court's entirely correct endorsement of *FindWhat's* conclusion in its first summary judgment Order: "Defendants whose fraud prevents preexisting inflation in a stock price from dissipating are just as liable as defendants whose fraud introduces inflation into the stock price in the first instance." SA17. Faced with exactly the same situation—an expert who did not disaggregate certain statements from a damages calculation—another district court recently

concluded, correctly, that "there is no requirement that [the expert] have done so." *In re DVI, Inc. Sec. Litig.*, No. 03-cv-5336, 2014 WL 4634301, at *5 (E.D. Pa. Sept. 16, 2014).

### 4. Disaggregation Was Unnecessary under the Private Securities Litigation Reform Act As a Matter of Law.

Even if "disaggregation" of the Pharmacia statements were relevant, it was error to exclude Professor Fischel's testimony. Plaintiffs' position is that Pfizer is responsible for *all* the damages they suffered. If the jury determines that Pfizer committed a *knowing* violation of the securities laws—which the jury must determine under §78u-4(f)(3)(A)(iii)—then Pfizer is jointly and severally liable for plaintiffs' entire loss under 15 U.S.C. §78u-4(f)(2)(A). If Pfizer wishes to offer proof that it did not knowingly violate the securities laws and that Pharmacia's preacquisition conduct is responsible for some percentage of the loss, the Private Securities Litigation Reform Act allocates to the jury the task of apportioning fault between Pfizer and Pharmacia. *See* §78u-4(f)(3)(A)(ii). *See Sauer v. Burlington N. R.R.*, 106 F.3d 1490, 1494 (10th Cir. 1997) (rejecting argument "that there must be expert testimony precisely apportioning the injury on a percentage basis…. Although apportionment may be difficult, like comparative negligence it is a question for which juries are well suited.").

## II. IT WAS AN ABUSE OF DISCRETION TO EXCLUDE THE INDISPENSABLE TESTIMONY OF A QUALIFIED EXPERT THAT THREATENED NO PREJUDICE TO DEFENDANTS WHERE NO DISCOVERY RULE OR ORDER WAS VIOLATED.

Courts hesitate to exclude evidence even if proffered outside of the discovery rules (which was not the case here) where exclusion would be outcome-determinative and there is no prejudice to the opponent. In this Circuit, courts apply a four-factor test, examining (1) the party's explanation for the delay in providing new evidence; (2) the importance of the evidence to the party's case; (3) the prejudice suffered by the opposing party as a result of having to prepare to address the new testimony; and (4) the possibility of a continuance. *See Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*, No. 12-cv-220, 2014 WL 1572746, at *4 (D. Conn. Apr. 17, 2014) (citing *Softel, Inc. v. Dragon Med. & Sci. Commc'ns., Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)).[15]

In *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 213 (2d Cir. 2009), this Court held that the exclusion of expert testimony constituted an abuse of discretion, even though it was not

---

[15]     Other Circuits apply similar tests. *See*, *e.g.*, *S. States Rack & Fixture, Inc. v. Sherwin-Williams C*o., 318 F.3d 592, 597 (4th Cir. 2003); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); *Wegener v. Johnson*,

outcome-determinative. Because the defendant failed to comply with an order requiring the submission of *Daubert* briefs, the trial court precluded its experts—a classic trial management ruling. Even without its experts, the defendant was free to cross-examine the plaintiff's expert, and the trier of fact was free to reject the plaintiff expert's testimony. Nonetheless, this Court ruled: "Although the trial judge is accorded considerable discretion in enforcing its pretrial orders, we conclude that the order to preclude [the party's] two expert witnesses exceeded the discretion of the District Court." *Id.* The preclusion order in the instant case presents an even greater burden—it terminated Plaintiffs' decade-old case. If, as this Court held, there was an abuse of discretion in *Zerega Ave.*, the conclusion that discretion was abused here follows *a fortiori*.

### A.     Plaintiffs Were Not Dilatory.

There was no failure by Plaintiffs to comply with any order of the District Court or any rule. Professor Fischel's Supplemental and Amended Supplemental Reports were not tardy. Even though, as the Court noted, they were submitted after the close of expert discovery, that was dictated by the date of the summary judgment ruling, which followed the close of discovery.

---

527 F.3d 687, 692 (8th Cir. 2008); *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).

Plaintiffs timely served the Supplemental Report and received permission to file their motion to submit the Amended Supplemental Report two days after the Court's ruling on the motion *in limine*, and made their submission within two weeks. Moreover, "[t]he time for supplementation [under Rule 26(e)] is not limited to the discovery period." *Burger v. Excel Contractors, Inc.*, No. 12-cr-01634, 2013 WL 5781724, at *3 (D. Nev. Oct. 25, 2013). There was no basis for rejecting Professor Fischel's supplements as "untimely." SA35.

### B. Professor Fischel's Testimony Was Critical to Plaintiffs' Case.

The exclusion of Professor Fischel's testimony was outcome-determinative. It came after ten years of litigation in which the District Court found Plaintiffs' claims sufficient to overcome Defendants' motion to dismiss, two motions for reconsideration, and a motion for summary judgment. The Court found that Rule 23 requirements for class certification were satisfied, and the class had already received notice of the action. After a five-day evidentiary hearing in 2009, the Court concluded that Plaintiffs' medical experts overcame defendants' *Daubert* challenges. Even when there

are discovery violations—*and here there were none*—courts hesitate to impose such an extreme sanction.[16]

In *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 295-300 (3d Cir. 2012), the district court denied plaintiffs' request to submit alternative damages estimates after excluding their expert's original opinion as unreliable. The Third Circuit upheld the decision to exclude but reversed the refusal to allow an amendment: "We are mindful that the District Court has considerable discretion in matters regarding expert discovery and case management," but "exclusion of critical evidence is an 'extreme' sanction, and thus, a district court's discretion is not unlimited." *Id.* at 297. The Court reasoned:

> [P]erhaps the most important factor in this case is the critical nature of the evidence, and the consequences if permission to amend is denied. Expert testimony is necessary to establish damages in an antitrust case.... The District Court's decision therefore would clearly influence the outcome of the case.

---

[16] *See*, *e.g.*, *Papyrus Tech. Corp. v. NYSE, LLC*, 257 F.R.D. 39, 45 (S.D.N.Y. 2009) (allowing supplemental expert report at summary judgment stage because exclusion of expert testimony "is a drastic measure" and would lead to a result where the client's right to a correct and just decision would be seriously undermined) (citing *Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 159 (S.D.N.Y. 2007) ("The Court is also mindful that the preclusion of evidence, let alone expert evidence, 'is a drastic remedy and will apply only in situations where the failure to disclose represents a flagrant bad faith and callous disregard of the rules.'")).

*Id.* at 299-300. *See also Dunning v. Bush*, 536 F.3d 879, 889-90 (8th Cir. 2008) (abuse of discretion to exclude testimony of expert who submitted a late supplement resulting in dismissal of one of plaintiffs' contract claims); *Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir. 2000) ("where exclusion necessarily entails dismissal of the case, the sanction 'must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction'"); *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004) (same); *Steele v. Aramark Corp.*, 535 F. App'x 137, 143 (3d Cir. 2013) ("The exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence"); *Gillum v. United States,* 309 F. App'x 267, 270 (10th Cir. 2009) ("the total exclusion of Dr. Eckardt's testimony, which necessarily resulted in the grant of summary judgment for the United States, was too extreme a sanction"); *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992) ("Only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits is dismissal an appropriate sanction.").

Courts in this Circuit have allowed experts to remedy defects in a report after a successful *Daubert* challenge. For example, the court allowed a

*Daubert* challenge to two damage experts in *Linkco, Inc. v. Fujitsu Ltd.*, No. 00-cv-7242, 2002 WL 158551, at \*16-17 (S.D.N.Y. July 16, 2002), but gave both an opportunity to revise their excluded reports to accord with the Court's decision on the measure of damages. Similarly, in *Nelson v. Matrixx Initiatives*, No. 09-cv-02904, 2012 WL 3627399, at \*7, 8-9 (N.D. Cal. Aug. 21, 2012), the court initially excluded the plaintiff's expert on the issue of causation, but permitted the expert to amend his report. *Id.* at \*30.

### C.   There Was No Prejudice to Defendants.

Even if the supplements had been untimely, any delay was harmless and did not warrant preclusion. *Capitol Records v. Mp3tunes, LLC*, No. 07-cv-9931, 2014 WL 503959, at \*12 (S.D.N.Y. Jan. 29, 2014) ("Failure to comply with the mandate of the Rule is harmless when there is no prejudice to the party entitled to the disclosure."). *See Powerweb*, 2014 WL 1572746, at \*5 (finding any prejudice to defendants mitigated by the fact that they had the opportunity to depose plaintiff's expert after receiving the supplemental report); *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (permitting experts to issue

supplemental reports where they provided explicit bases for their initial conclusions, but "did not alter [their] position[s]").[17]

Pfizer could not suffer prejudice from Professor Fischel's offer to use *Pfizer's own* approach to calculating damages. Pfizer had deposed Professor Fischel three times, understood—and had no objection to—his underlying event study methodology, and was well aware of the manner in which Pfizer itself proposed to address the summary judgment Order's exclusion of the two corrective disclosures.

Permitting Fischel to testify as proposed in the Amended Supplemental Report would not have required either an additional Fischel deposition or moving the September 9, 2014, trial date, although there would have been no prejudice if either had been warranted. Plaintiffs had expeditiously moved for leave to submit the Amended Supplemental Report more than three months before the trial date, and the schedule had ample

---

[17] *See also, e.g., Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012) ("Harmlessness means an absence of prejudice to the defendant."); *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd*., No. 11-cv-726, 2013 WL 4409434, at *13 (E.D.N.Y. Aug. 2, 2013) ("An omission or delay in disclosure is harmless where there is 'an absence of prejudice' to the aggrieved party"); *Redd v. N.Y. State Div. of Parole*, 923 F. Supp. 2d 393, 407 (E.D.N.Y. 2013) ("A violation of Rule [26] is harmless when there is no prejudice to the party entitled to the disclosure.").

room for additional trial preparation (including another Fischel deposition) if Pfizer had wished. The parties and Court had contemplated supplemental briefing in the summer of 2014 to address the implications of the Supreme Court's *Halliburton* decision. That proved to be unnecessary, given the eventual decision in *Halliburton*, so there was a resulting cushion in the schedule to address any issues associated with Professor Fischel submitting the Amended Supplemental Report. No continuance would have been needed, even if Defendants wished to depose Professor Fischel a fourth time.

## III. THE DISTRICT COURT ERRED IN DISMISSING CLAIMS BASED ON THE PHARMACIA STATEMENTS.

Even if, *arguendo,* there were a requirement to "disaggregate" Pfizer from Pharmacia statements, it should not apply here. The District Court's ruling (in its first summary judgment Order), dismissing claims against Pfizer arising from statements by Pharmacia employees in newspaper articles, erroneously disregarded evidence that Pfizer had "ultimate authority" over those statements under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011). *See* SA27-28. The Court's ruling is reviewed *de novo*, construing the evidence in favor of Plaintiffs, and must be reversed "if there is any evidence in the record from which a jury could draw a reasonable inference" in Plaintiffs' favor. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

64

The District Court disregarded evidence that Pfizer and Pharmacia had ultimate authority over each other's statements regarding the drugs. A647, 650-51, 661, 664-66, 669-72, 697-98. The evidence showed that all public communications regarding Celebrex and Bextra were approved in advance by Pfizer. A647-48. *See SEC v. Pentagon Capital Management PLC*, 725 F.3d 279, 286-87 (2d Cir. 2013) ("The brokers may have been responsible for the act of communication [of the false statements to the mutual funds], but … [the brokers' customers] retained ultimate control over both the content of the communication and the decision to late trade."); *In re Puda Coal Sec. Litig.*, No. 11-cv-2598, 2014 WL 3427284, at *4-5 (S.D.N.Y. July 14, 2014) (underwriters had "ultimate authority" over statements in prospectus that could not be issued without their "sign off"); *Elbit Sys., Ltd. v. Credit Suisse Group*, 917 F. Supp. 2d 217, 227 (S.D.N.Y. 2013).[14] The Court properly concluded that Pfizer had ultimate authority over Pharmacia press releases about the drugs and thus sustained Plaintiffs' claims as to one Pharmacia press release (SA28), but its decision to dismiss

---

[14]    The Court misinterpreted testimony that a Pharmacia employee was not a Pfizer spokesperson (SA28), which in any event, conflicted with testimony by Pfizer's media relations director that all statements were Pfizer-approved. "[C]hoices between conflicting versions of the events are matters for the jury, not the court on summary judgment...." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

claims as to another because the release was coincidentally included in a Pharmacia SEC filing (*id.*), was erroneous. The SEC filing was the form in which the otherwise actionably false press release was available to Plaintiffs and the act of filing it with the government did nothing to lessen the ultimate authority the Court had already found Pfizer exercised over statements about the drugs in press releases.

## **CONCLUSION**

"The word 'abuse' in the 'abuse of discretion' standard is an unfortunate—and inaccurate—term of art. When a ... court abuses its discretion, it involves nothing as heinous as *abuse.* Indeed, a so-called abuse of discretion often involves something quite common and unavoidable in a system of adjudication: a 'view of the law' that is simply 'erroneous.'" *In re City of N.Y.*, 607 F.3d 923, 943 n.21 (2d Cir. 2010) (emphasis in original). Here, the District Court abused its discretion in precluding Professor Fischel's testimony.

The judgment should be reversed, and the case remanded for further proceedings, including trial on the merits.

Dated:    November 19, 2014          Respectfully submitted,


                                     _____/s/ Gregory P. Joseph_____
                                     **JOSEPH HAGE AARONSON LLC**
                                     Gregory P. Joseph
                                     Douglas J. Pepe
                                     Sandra M. Lipsman
                                     485 Lexington Avenue, 30th Floor
                                     New York, New York 10017
                                     212-407-1200

                                     **GRANT & EISENHOFER P.A.**
                                     Jay W. Eisenhofer
                                     James J. Sabella
                                     Charles T. Caliendo
                                     485 Lexington Avenue, 29th Floor
                                     New York, New York 10017
                                     646-722-8500

                                     **MASSEY & GAIL LLP**
                                     Jonathan S. Massey
                                     1325 G St. NW, Suite 500
                                     Washington, D.C. 20005
                                     202-652-4511

                                     **KESSLER TOPAZ MELTZER
                                       & CHECK, LLP**
                                     David Kessler
                                     Andrew L. Zivitz
                                     Matthew L. Mustokoff
                                     280 King of Prussia Road
                                     Radnor, Pennsylvania 19087
                                     610-667-7706

                                     *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C) that the attached brief is proportionally spaced, has a typeface (New Times Roman) of 14 points, and contains 13,690 words (excluding, as permitted by Fed. R. App. P. 32(a)(7)(B), the corporate disclosure statement, table of contents, table of authorities, and certificate of compliance), as counted by the Microsoft Word processing system used to produce this brief.


        /s/ James J. Sabella
        James J. Sabella